## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

JESSE JACKSON,
*Individually and for Others Similarly Situated,*

      Plaintiff,

v.

      Civil Action No. 22-1456-TDC

AMERICAN ELECTRONIC WARFARE
ASSOCIATES, INC.,

      Defendant.

## MEMORANDUM OPINION

Plaintiff Jesse Jackson, acting individually and on behalf of similarly situated individuals, has filed this civil action against his former employer, American Electronic Warfare Associates, Inc. ("AEWA"), in which he alleges that he did not receive overtime pay, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219; the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab. & Empl. §§ 3–415(a), 3–420(a) (LexisNexis 2016); and the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. § 3–505(a). Jackson asserts the FLSA claim as a collective action under 29 U.S.C. § 216(b) and the Maryland state law claims as a class action under Federal Rule of Civil Procedure 23. Presently pending before the Court are (1) AEWA's Motion for Summary Judgment; (2) Jackson's Cross Motion for Summary Judgment; and (3) Jackson's Motion for a Protective Order, Corrective Notice, and Additional Requests for Production ("the Motion for a Protective Order"), which are all fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, AEWA's Motion for

Summary Judgment will be DENIED, Jackson's Cross Motion for Summary Judgment will be DENIED, and Jackson's Motion for a Protective Order will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Prior factual background is set forth in the Court's August 10, 2023 Memorandum Opinion granting conditional certification of an FLSA collective action in this case and the Court's February 12, 2024 Memorandum Opinion granting certification of a Rule 23 class action for the Maryland state law claims, which are incorporated by reference. *Jackson v. Am. Elec. Warfare Assocs., Inc.*, No. TDC-22-1456, 2023 WL 5154518 (D. Md. Aug. 10, 2023) ("*Jackson I*"); *Jackson v. Am. Elec. Warfare Assocs., Inc.*, No. TDC-22-1456, 2024 WL 556230 (D. Md. Feb.12, 2024) ("*Jackson II*"). The specific factual background and procedural history relevant to the present Motions are set forth below.

## I.    The FLSA  Collective Action and the Maryland Class Action

AEWA is a corporation that provides technological services for the United States Department of Defense ("DOD") pursuant to government contracts. Plaintiff Jesse Jackson worked at AEWA as an engineer from February 2, 2015 to September 2, 2021, when he resigned. His job duties included, among other activities, developing technical and engineering standards, conducting tests and analyzing results, setting up databases, and maintaining equipment for testing. At the outset of his employment, Jackson received an offer letter stating that he would receive an "annualized salary" of $68,910.40 which was "to be paid semi-monthly, at an hourly rate of $33.31." Joint Record ("J.R.") 445, ECF Nos. 130, 130-1, 130-2, 130-3, 130-4. On multiple occasions, Jackson received a pay raise, referred to in written notices as a "merit increase" in his

"hourly rate," J.R. 468–69, such that at the time of his resignation he was being paid pursuant to a written notice stating that his hourly rate had increased to $44.70.

In the Complaint, Jackson alleges that he and other similarly situated AEWA employees were paid on an hourly basis and were not paid one-and-a-half times their hourly rate for overtime hours, as required by the FLSA, MWHL, and MWPCL. Jackson asserts that he is owed overtime pay for the overtime hours that he worked between June 14, 2019 and his last day of work, September 2, 2021. On August 10, 2023, the Court granted conditional certification of a collective action as to the FLSA claim ("the FLSA collective action"), *see Jackson I*, 2023 WL 5154518, at \*1, \*5, and on February 12, 2024, the Court certified a class action under Federal Rule of Civil Procedure 23 on the Maryland state law claims ("the Maryland class action"), *Jackson II*, 2024 WL 556230, at \*1, \*6. The individuals who were eligible to opt in to the FLSA collective action consisted of the following persons: "All current and former employees of [AEWA] during the past 3 years who were paid straight time for overtime" ("the FLSA class"), which covers at most the time period from August 30, 2020 to August 30, 2023, consisting of the three years prior to the issuance of the FLSA collective action notice. *Jackson I*, 2023 WL 5154518, at \*1, \*5 (noting that members of the FLSA class are eligible to recover damages only for the time period "within three years of the date that they file written consent to join the collective action"). The class members for the Maryland class action consist of the following persons: "All current and former [AEWA] employees classified as exempt and paid straight time for overtime in Maryland from June 14, 2019 through" the date of class certification, which was February 12, 2024 ("the Maryland class"). *Jackson II*, 2024 WL 556230, at \*2. According to AEWA, 127 current or former employees fall within the definition of the FLSA class and 177 fall within the definition of the Maryland class (collectively, "the class members").

3

## II.    **AEWA Job Classifications and Work Schedules**

Generally, AEWA internally classifies all job positions as "exempt" or "non-exempt" for purposes of federal wage and hour laws such as the FLSA. J.R. 392. From the beginning of his employment at AEWA in February 2015 through January 2017, Jackson was classified as a non-exempt employee and was paid at one-and-a-half times his hourly rate for the overtime hours that he worked. In January 2017, Jackson's engineer position was reclassified as an exempt position following an audit through which AEWA concluded that some positions at AEWA, including Jackson's position as an engineer, should be reclassified from non-exempt to exempt. After Jackson and the other employees affected by the January 2017 audit were reclassified from non-exempt to exempt, they stopped receiving overtime pay at one-and-a-half times their hourly rates and began receiving overtime pay at their regular hourly rates, which, according to Jackson, "upset" the affected employees. J.R. 30. Jackson remained classified as exempt for the remainder of his employment.

During the time period relevant to the FLSA collective action and the Maryland class action (collectively, the "class actions"), which runs from June 14, 2019 through February 12, 2024 ("the relevant time period"), when class members received offers of employment from AEWA, the offer letters stated whether the offered position was considered by AEWA to be "exempt" for "purposes of federal wage & hour law." *See, e.g.*, J.R. 447, 450, 456, 458. The offer letters stated the position's "annual salary . . . (less lawful deductions)," stated that the employee would be "paid semi-monthly," and provided an "hourly rate" equivalent, which AEWA calculated by dividing the annual salary by the number of weeks in a year, 52, and the number of hours in a standard work week, 40. J.R. 447–60.

4

During the relevant time period, class members worked one of three work schedules labeled by AEWA as (1) "Default," (2) the main Compressed Work Schedule, or "CWS Main," or (3) the alternative Compressed Work Schedule, or "CWS Alt." Joint Statement of Undisputed Facts ("JSUF") ¶ 3, ECF No. 110-2. Class members who worked the Default schedule worked eight hours per day from Monday to Friday. Class members who worked either of the CWS schedules worked nine hours per day from Monday to Thursday and eight hours per day on alternating Fridays such that each Friday, class members on one of the CWS schedules worked no hours and class members on the other CWS schedule worked eight hours. For payroll purposes, the work week at AEWA begins each Friday at 12:00 noon and ends the following Friday at 11:59 a.m., which ensures that each of the schedules have 40 hours of work scheduled every work week.

## III.    AEWA Pay Practices

During the relevant time period, AEWA paid class members twice a month, or semi-monthly, with each paycheck reflecting payment for the preceding pay period. The first pay period of a month included the first day of the month through the fifteenth day of the month, and the second pay period included the sixteenth day of the month through the last day of the month.

Class members and other AEWA employees were required to submit electronic timesheets on which they recorded the number of hours that they worked each day in each pay period. By company policy, exempt employees were required to account for every work hour included in a pay period, consisting of a total of 40 hours in a typical work week. AEWA has asserted that this time tracking policy is necessary because the Defense Contract Audit Agency ("DCAA"), the federal agency that conducts financial oversight of government contracts for DOD and other agencies, has promulgated regulations that AEWA asserts require "all employees [of contractors] to record all hours on their timesheet according to the project supported." J.R. 395.

5

Under the pay system used for paychecks issued prior to 2023, which covered pay for work conducted up to December 16, 2022 ("the pre-2023 pay system"), class members' pay for a particular pay period was calculated by multiplying the number of hours worked in a pay period by the hourly-rate equivalent of their salary. For example, in the pay period that that ended on June 15, 2021, Jackson earned $4,298.40 in gross earnings, a figure that equals his hourly rate at that time, which was $39.80, multiplied by the number of hours that he worked that pay period, which was 108. Similarly, Kyle Bishop, a former AEWA engineer and a class member, has stated in a declaration that while he was employed at AEWA he was paid at an hourly rate of $48.08, and his pay stub for the pay period ending on April 30, 2022 demonstrates that he earned $3,990.64 in gross pay for 83 hours of work.

AEWA has acknowledged that it had a policy of paying "straight-time for every hour worked above the timesheet period requirements" to exempt employees during the relevant time period. J.R. 395. Under this policy, class members, who were classified as exempt employees, earned the same hourly rate for all hours recorded in a timesheet, including hours exceeding 40 hours in a full work week. In its internal records, AEWA designates hours worked to meet the pay period requirements as "R," for "Regular" hours, and overtime hours worked by exempt employees as "O1" hours, referring to overtime hours paid as straight time. J.R. 822.

When a class member worked fewer hours than what the pay period required, AEWA required that employee to input into that pay period's timesheet entries showing usage of a form of paid leave, such as vacation or sick leave, in order to get paid for a full 40 hours per week. Based on the AEWA employee handbook, however, an employee who did not have available leave and did not work a full 40 hours in a particular week would not necessarily be paid for that number of hours that week.

6

When the class members received notices of pay raises from AEWA, those notices typically described the change by stating that the class member had been awarded a "merit increase" of a specific percentage, and that the class member's "hourly rate will be increased to" a newly calculated hourly rate, without reference to whether the employee's annual salary had changed. *See, e.g.*, J.R. 465, 467–71, 474–75. AEWA executives have characterized employees classified as exempt, such as the class members, as paid on an hourly basis. In response to a question at his deposition about whether certain exempt employees' pay was "based on an hourly rate for each hour that they work," the President and Chief Executive Officer ("CEO") of AEWA, Charles Jeffries, stated, "Everybody is paid on an hourly rate except for overtime, which exempt people are paid straight time. Non-exempt, time and a half." J.R. 85. Similarly, after she was shown written notices of Jackson's pay raises, a former AEWA human resources ("HR") manager, Corrine Jeffries, agreed with the statement that "based on the documentation, it looks like Mr. Jackson was paid on an hourly basis" and acknowledged that he was not paid a salary. J.R. 439, 441.

Although AEWA has asserted that through the pre-2023 pay system, it paid class members, "a consistent salary rate of 1/52th of the annual salary per work week," J.R. 390–91, in practice, the semi-monthly pay stubs from that time period did not always reflect payment of a consistent weekly salary equal to an annual salary divided by 52. For example, from February 2021 through December 2022, Jane Gee, a class member, consistently worked fewer than 80 hours each semi-monthly pay period and was consistently paid for fewer than 80 hours in each of those pay periods. Separately, during the second pay periods of February 2021 and February 2022, multiple class members received pay for fewer than 80 hours of work.

7

The number of hours that a class member had to work in a particular pay period could vary for several reasons. First, because some months have more days than others, the number of days in each semi-monthly pay period could differ. Second, the beginning and end of each semi-monthly pay period did not always coincide with the beginning and end of a work week. Third, in light of the three different work schedules at AEWA, the class members were scheduled to work a different number of hours each day of the week, which would be eight under the Default schedule or on alternating Fridays under the CWS schedules, nine in the case of Mondays through Thursdays under the CWS schedules, or none on alternating Fridays under the CWS schedules. Accordingly, the number of hours that a class member had to account for in a pay period varied from 71 hours to 98 hours, depending on the month and the class member's work schedule.

Beginning with the first paychecks issued in 2023, AEWA changed its pay system. Since then, AEWA has been paying class members a fixed semi-monthly amount each pay period, regardless of the number of required hours in that pay period, which is equal to their annual salaries divided by the number of pay periods in a year, which is 24 ("the current pay system"). The class members are still paid straight time for overtime in the same manner described above.

## DISCUSSION

In its Motion for Summary Judgment, AEWA argues that it is entitled to summary judgment because the record definitively establishes that the class members are exempt from the overtime requirements of the FLSA, MWHL, and MWPCL. In his Cross Motion Summary Judgment, Jackson argues that the record definitively establishes the opposite—that, at least under the pre-2023 pay system, the class members were not exempt employees—and seeks partial summary judgment on all claims relating to work conducted under that system. Separately, in his Motion for a Protective Order, Jackson asserts that AEWA engaged in improper communications

with the class members during the opt-in period for the FLSA collective action and the opt-out period for the Maryland class action, which necessitates various forms of relief relating to the management of the class actions.

## I.     Cross Motions for Summary Judgment

In its Motion for Summary Judgment, AEWA argues that the class members are exempt from the federal and state overtime pay requirements pursuant to a statutory exemption for personnel "employed in a bona fide . . . professional capacity," 29 U.S.C. § 213(a)(1), because there is no dispute that they qualify as professional employees and the record establishes that they were paid on a salary basis. In opposing that Motion and in his Cross Motion for Summary Judgment, Jackson argues that the record demonstrates conclusively that the class members did not qualify as exempt employees under the pre-2023 pay system because they were paid on an hourly basis, and that, at a minimum, there is a genuine dispute of material fact on whether they qualified as exempt employees under the pre-2023 pay system, which precludes a grant of summary judgment to AEWA.

### A.     Legal Standards

#### 1.     Motion for Summary Judgment

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court must believe the evidence of the non-moving party, view the facts in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "A material fact is one that might affect the outcome of the suit under the governing law."

*Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248). A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

## 2.    Overtime Requirements

The FLSA generally requires that employees who work more than 40 hours in a week receive overtime pay at the rate of one and one-half times their regular pay. 29 U.S.C. § 207(a)(1). However, an employer does not need to pay this overtime rate to "any employee employed in a bona fide . . . professional capacity" ("the professional capacity exemption"). 29 U.S.C. § 213(a)(1). Regulations promulgated by the United States Department of Labor ("DOL") provide that employees fall within the professional capacity exemption if they satisfy three criteria: (1) they are "compensated on a salary or fee basis"; (2) their weekly salary is not less than a minimum level set by regulation, which during the relevant time period was $913 per week until January 1, 2020, and $684 per week after that date, 29 C.F.R. § 541.600(a) (2019), 29 C.F.R. § 541.600(a) (2023); and (3) their "primary duty" consists of performing work "[r]equiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction," or "[r]equiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor." 29 C.F.R. § 541.300 (2024). An employer asserting that certain employees fall within an exemption to the FLSA bears the burden of

10

demonstrating, by a preponderance of the evidence, that the exemption applies. *E.M.D. Sales, Inc. v. Carrera*, 145 S. Ct. 34, 37 (2025).

Like the FLSA, the MWHL requires that employers "pay an overtime wage of at least 1.5 times the usual hourly wage," Md. Code Ann., Lab. & Empl. 3–415(a), but it also contains an exemption for personnel who are employed in a professional capacity, *id.* § 3–403(1). The MWHL's professional capacity exemption is defined in the same way as the FLSA's professional capacity exemption. *See* Md. Code. Regs. 09.12.41.17 (2025); *Williams v. Genex Servs., LLC*, 809 F.3d 103, 105 n.2 (4th Cir. 2015). The MWPCL, Md. Code Ann. Lab. & Empl. § 3–505(a), has also been interpreted to include a requirement that an employer pay employees "unlawfully withheld" unpaid overtime wages. *Peters v. Early Healthcare Giver, Inc.*, 97 A.3d 621, 625–26 (Md. 2014). In light of the requirement that the unpaid overtime wages be "unlawfully withheld," an employer is not liable for unpaid overtime under the MWPCL if it can demonstrate that the employees at issue are exempt under the FLSA and the MWHL. *See Lovo v. Am. Sugar Refining, Inc.*, No. RDB-17-418, 2018 WL 3956688, at *16 (D. Md. Aug. 17, 2018). Accordingly, Jackson's overtime claims under the FLSA, MWHL, and MWPCL can be analyzed together under the FLSA standards.

### B.    Disputed Evidence

At the outset, the parties dispute whether the Court may consider various exhibits that are attached to their Cross Motions for Summary Judgment. In assessing motions for summary judgment, courts generally may not consider evidence that is inadmissible under the Federal Rules of Evidence. *See Giles v. Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 704 (4th Cir. 2023). However, courts may consider "the content or substance of otherwise inadmissible materials where . . . 'the party submitting the evidence show[s] that it will be possible to put the information . . . into an

11

admissible form.'" *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538 (4th Cir. 2015) (quoting 11 James Wm. Moore et al., Moore's Federal Practice § 56.91[2] (3d ed. 2015)).

First, AEWA asserts that the Court may not consider a chart submitted by Jackson which purports to summarize a set of pay records that AEWA produced in discovery. Federal Rule of Evidence 1006 allows summary charts to be admitted into evidence "as a surrogate for underlying voluminous records that would otherwise be admissible into evidence," provided that the chart is "an accurate compilation" of the records and "the records summarized [are] otherwise . . . admissible in evidence." *United States v. Janati*, 374 F.3d 263, 272 (4th Cir. 2004); *see also* Fed. R. Evid. 1006. Where Jackson has submitted a declaration stating that the chart is a summary of admissible evidence and provided the underlying records which are asserted to be admissible as business records, *see* Fed. R. Evid. 803(6), and AEWA has not contested the accuracy of the chart or the admissibility of the underlying records, the Court will consider Jackson's chart in resolving the Motions.

Second, Jackson asserts that the Court may not consider an amended version of his summary chart submitted by AEWA and a supporting declaration by Jodi Pilkerton, AEWA's Chief Administrative Officer ("CAO"), which purport to provide further details relating to the pay records summarized in Jackson's chart based on Pilkerton's review of other, unspecified AEWA records. Although the failure to produce the records reviewed by Pilkerton weighs against consideration, her declaration states that the additional information in AEWA's version of the chart is based on her "personal knowledge" and her review of "records maintained by [AEWA] in the regular course of its business." J.R. 2093. Based on the declaration, the Court finds that AEWA has sufficiently demonstrated that it can "put the information" in AEWA's chart "into an

12

admissible form" at trial by having Pilkerton testify to its contents and through the admission of the records that she reviewed, which as described are likely admissible as business records. *Humphreys & Partners Architects*, 790 F.3d at 538; *see* Fed. R. Evid. 803(6). Under such circumstances, the chart itself likely could be used at trial as a demonstrative aid pursuant to Federal Rule of Evidence 611(a). *See Janati*, 374 F.3d at 273 (stating that Rule 611(a) permits the use of a chart to "facilitate the presentation and comprehension of evidence already in the record," which may include the "witness's conclusions" about the evidence, "to aid the jury in its understanding of the evidence that has already been admitted"). Accordingly, the Court will also consider AEWA's summary chart and Pilkerton's supporting declaration in resolving the Motions.

Finally, Jackson asserts that the Court may not consider an expert witness report by Dr. Robert B. Speakman, Jr., an economics consultant retained by AEWA, in which he (1) reviewed AEWA pay data and timekeeping data "to determine whether [AEWA]'s pay practices are consistent with [the class members] receiving a fixed or guaranteed pay amount each week"; and (2) "note[d] any pay periods in which a class member is paid more than 1.5 times the fixed or guaranteed pay period amount, if there is such an amount." J.R. 234. In describing his methodology, Dr. Speakman states that he "sum[med] the hours amounts by pay period in" the timekeeping data and "match[ed]" the time and pay data "by employee, pay period, and pay type." J.R. 239. In a declaration supporting his report, Dr. Speakman further stated that he provided Jackson with the materials on which he relied, and Pilkerton stated in a declaration that those records had been "created and maintained in the regular course of [AEWA's] business." J.R. 282.

Where the Court specifically instructed Jackson to assert his arguments against the admission of Dr. Speakman's expert testimony within the briefing on the present Motions, AEWA's claim that the failure to file a separate motion bars Jackson's argument is unfounded.

13

*See* Order at ¶¶ 1–2, ECF No. 97. Nevertheless, where Dr. Speakman submitted a declaration attesting to the contents of the expert report, the data underlying his findings appear to derive from AEWA's timesheets and pay records, and Jackson has not identified any specific errors in the methodology or calculations, the Court finds no basis for excluding Dr. Speakman's calculations and tables, the latter of which arguably constitute summaries of records under Rule 1006 in that they appear to contain figures that are either taken directly from the timesheets or pay records, or calculated using figures from those records. The fact that Jackson separately argues that Dr. Speakman's analysis largely consists of "basic mathematics" that does not require expertise effectively undermines the claim that his methodology is not reliable. Pl.'s Opp'n & Mot. Summ. J. at 20, ECF No. 114.

While Dr. Speakman's calculations may not be so complicated that the same information arguably could have been presented through a lay witness called to summarize the contents of the timesheets and pay records, if that were the case, the calculations would still be admissible. *United States v. Mosby*, 626 F. Supp. 3d 847, 863–64 (D. Md. 2022) (holding that a forensic accountant could testify as a lay witness to present and discuss charts that summarize financial records). Here, however, the Court finds that the means by which hours were recorded and pay was determined were sufficiently complicated that Dr. Speakman's calculations and analysis would be beyond the ordinary knowledge of the jury, such that the proffered expert testimony would be helpful to the jury. *See Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 162 (4th Cir. 2012) (stating that when assessing whether expert testimony is reliable, "the district court must decide whether the expert has 'sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case'" (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999))); *WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F.3d 1032, 1040 & n.7 (8th Cir. 2011) (holding that "there is

not . . . an implicit requirement in [Rule] 702 for the proffered expert to make **complicated** mathematical calculations," and noting that even if the expert's testimony was "inadmissible under [Rule] 702 because it was too straightforward, it was admissible" under Rule 1006). The Court will therefore consider Dr. Speakman's calculations and tables, as well as his opinions that the pay records from the pre-2023 pay system are consistent with the class members being paid a fixed amount every work week for regular hours worked. The Court will not, however, consider Dr. Speakman's opinions to the extent that they definitively state that the class members were paid a fixed amount or state that the pay records are consistent with the class members being paid a guaranteed amount, or on a salary basis, because the question of whether there was a guarantee relates primarily to whether there was a legal contract or agreement among the parties, issues that are beyond the expertise of Dr. Speakman and also are close enough to the ultimate question that the probative value of any such opinion is outweighed by the danger of unfair prejudice. *See* Fed. R. Evid. 702, 403; *United States v. McIver*, 470 F. 3d 550, 562 (4th Cir. 2006) (stating that "opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible" and noting that courts should "identify improper legal conclusions by determining whether 'the terms used by the witness have a separate, distinct, and specialized meaning in law different from that present in the vernacular'" (quoting *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002))).

## C.    AEWA's Motion

In its Motion, AEWA seeks summary judgment on all claims on the grounds that the evidence establishes that the class members are exempt from the overtime pay requirements pursuant to the professional capacity exemption. AEWA asserts, and Jackson does not contest,

that the only element of the professional capacity exemption in dispute is the requirement that the class members were "compensated on a salary . . . basis." 29 C.F.R. § 541.300(a)(1).

DOL has promulgated regulations that create two alternative tests for assessing whether an employee is paid on a salary basis, only one of which needs to be satisfied. *See Helix Energy Sols. Grp., Inc. v. Hewitt*, 143 S. Ct. 677, 685–86 & n. 3 (2023).

### 1.    29 C.F.R. § 541.602(a)

The first definition for being paid "on a salary basis" is set forth in 29 C.F.R. § 541.602(a) ("Section 602(a)"), which provides that:

> An employee will be considered to be paid on a "salary basis" within the meaning of this part if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed.

*Id.*

In *Helix Energy*, the United States Supreme Court considered a pay system under which an oil rig supervisor received a paycheck every two weeks that paid him an amount equal to the number of days worked during that pay period times a daily rate and held that such a system did not comport with Section 602(a)'s definition of a salary-basis pay system. 143 S. Ct. at 684–85. In so holding, the Court interpreted Section 602(a)'s reference to a "basis" of pay to refer "to the unit or method for calculating pay, not the frequency of its distribution." *Id.* at 687. Accordingly, Section 602(a)'s "demand that a salaried worker get a preset, fixed amount 'on a weekly[] or less frequent basis' means that his paycheck reflects how many weeks—not days or hours—he has worked." *Id.* at 688.

Here, as to the pre-2023 pay system, the Court cannot conclude that the class members were paid on a "weekly or less frequent basis" as required by Section 602(a). *See* 29 C.F.R. §

16

541.602(a); *Helix Energy*, 143 S. Ct. at 688. First, class members' pay stubs from this pay system reflect payment on an hourly basis. For example, Jackson's pay stub for the pay period that ended on June 15, 2021 specifically states that his "rate type" was "hourly," and his gross earnings for that pay period were calculated by multiplying his hourly rate at that time, which was $39.80, by the number of regular and straight-time overtime hours that he worked. J.R. 775. Similarly, Kyle Bishop, a class member and a former AEWA engineer, has stated in a declaration that while he was employed at AEWA he was paid at an hourly rate of $48.08, and his pay stubs reflect that rate being used to calculate his earnings for both regular and overtime hours worked. Where AEWA has acknowledged that under the pre-2023 pay system class members sometimes received varying amounts each pay period based on the number of hours that actually fell within that pay period, it is clear that pay was calculated not on a weekly or less frequent basis, but on an hourly basis.

Employment offer letters and notices of pay raises issued by AEWA, as well as statements by AEWA executives, support this conclusion. The offer letters that AEWA sent to class members, while listing an "annual salary" figure and stating that it would be "paid semi-monthly," consistently provided an "equivalent" "hourly rate" of pay. *See, e.g.*, J.R. 447–60. Significantly, when AEWA sent notices of pay raises, they typically described the change by stating that the class member had been awarded a "merit increase," and that "[y]our hourly rate will be increased to" a newly calculated hourly rate listed in the notice, with no reference to a new annual, monthly, or weekly salary. *See, e.g.*, J.R. 465, 467–71, 474–75. Moreover, in response to a deposition question about whether certain employees' pay was "based on an hourly rate for each hour that they work," the President and CEO of AEWA, Charles Jeffries, stated, "Everybody is paid on an hourly rate except for overtime, which exempt people are paid straight time. Non-exempt, time and a half." J.R. 85. Collectively, this evidence demonstrates that "the unit or method for

17

calculating pay" under the pre-2023 pay system was not a week or a less frequent unit, as Section

602(a) requires, but instead was an hour, which is inconsistent with the Section 602(a) salary-basis

test. *See Helix Energy*, 143 S. Ct. at 687.

### 2.    29 C.F.R. § 541.604(b)

The second definition for payment on a "salary basis" is set forth in 29 C.F.R. § 541.604(b)

("Section 604(b)"), which provides that:

> An exempt employee's earnings may be computed on an hourly, a daily or a shift
> basis, without losing the exemption or violating the salary basis requirement, if the
> employment arrangement also includes a guarantee of at least the minimum weekly
> required amount paid on a salary basis regardless of the number of hours, days or
> shifts worked, and a reasonable relationship exists between the guaranteed amount
> and the amount actually earned.

29 C.F.R. § 541.604(b).

Under Section 604(b), an employee who is paid on an hourly, daily, or shift basis can

nevertheless be deemed to be paid on a salary basis if the following requirements are satisfied: (1)

the employment arrangement includes a "guarantee" that the employee will be paid each week at

least the required minimum weekly salary amount set forth in the regulations, "regardless of the

number of hours, days, or shifts worked"; and (2) there is "a reasonable relationship" between this

guaranteed amount and "the amount actually earned." *Helix Energy*, 143 S. Ct. at 684 (quoting 29

C.F.R. § 541.604(b)).

In arguing that the pre-2023 pay system satisfied the requirements of Section 604(b),

AEWA primarily argues that the evidence shows, based on the expert report of Dr. Speakman, that

although the class members did not always receive the same amount of pay during each pay period,

and their pay stubs sometimes list and include pay for fewer than 80 hours per pay period, those

variations are consistent with those employees being paid a fixed amount each week. According

to this analysis, the variations in the number of hours are largely the result of the interplay between

18

(1) the varying work schedules, consisting of the Default schedule and the two different CWS schedules; and (2) the semi-monthly pay periods, which based on the number of days in a month and the number of work days in a pay period, could lead to varying numbers of hours allocable to each pay period.

Furthermore, in addressing Jackson's chart listing instances in which class members received pay for fewer than 80 hours in a pay period, which was offered to show that the employees were paid on an hourly basis and were not guaranteed a set weekly amount, AEWA CAO Jodi Pilkerton has asserted that the listed examples can all be explained by one the following justifications: (1) the class member was not employed by AEWA for the full pay period because the period was either the employee's first pay period or last pay period at AEWA; (2) the class member received worker's compensation during the relevant pay period; (3) the class member "was on a reduced 75% schedule during the relevant time frame," which resulted in that class member's salary being "fixed at a correspondingly lower rate," J.R. 2093; or (4) the referenced pay stub was for the second pay period in either February 2021 or February 2022 (collectively, "the disputed February pay periods"), which had either 71 or 72 required hours depending on the schedule type. The first two justifications identify bases under which the FLSA explicitly permits employers to pay salaried employees less than their guaranteed salary. *See* 29 C.F.R. § 541.602(b)(2) ("[A]n employer may make deductions from pay for absences of one or more full days if salary replacement benefits are provided . . . under a State workers' compensation law."); *id.* at § 541.602(b)(6) ("An employer is not required to pay the full salary in the initial or terminal week of employment.").

This evidence, while favorable to AEWA, does not conclusively establish that the class members were paid on a salary basis for two reasons. First, there remain genuine issues of material

fact on whether, as claimed by AEWA, the class members were always paid in a manner consistent with a fixed weekly salary. Most notably, AEWA acknowledges that the entries in Jackson's chart show that Jane Gee, a member of the Maryland class, received pay for fewer than 40 hours per week. Although AEWA, through Pilkerton, has asserted that the lower pay is justified because Gee "was on a reduced 75% schedule" such that "her salary was fixed at a correspondingly lower rate," J.R. 2093, such a practice of paying this employee less because she worked fewer hours is not consistent with a guarantee of payment of the regulatory weekly minimum salary "regardless of the number of hours . . . worked," as Section 604(b) requires. *See Helix Energy*, 143 S. Ct. at 684. Although Gee may have agreed to this arrangement, AEWA has provided no documentation or other evidence of it that would allow the Court to evaluate whether there actually was such an agreement, and that its terms are consistent with the salary-basis requirement.

Similarly, Pilkerton's explanation that lower pay amounts for the disputed February pay periods were simply the result of having fewer work days in those pay periods based on the calendar, lacks sufficient detail or documentary support. In particular, where the record does not include pay information for the pay periods that preceded and followed the disputed February pay periods, the Court cannot draw definitive conclusions about whether the class members received the equivalent of a fixed weekly amount for the relevant weeks of the disputed February pay periods. Indeed, as Jackson has noted, AEWA has provided no information on what records Pilkerton purportedly reviewed as a basis for her claims. Accordingly, particularly where the employer has the burden to establish the applicability of an exemption, *see E.M.D. Sales*, 145 S. Ct. at 37, the Court cannot, in viewing the evidence in the light most favorable to the nonmoving party, conclude that AEWA's explanations dispel any genuine issues of material fact on the reasons for these lower pay amounts and thus on whether under the pre-2023 pay system the class

members were paid on a salary basis pursuant to Section 604(b). *See Coates v. Dassault Falcon Jet Corp.*, 961 F.3d 1039, 1047 (8th Cir. 2020) (finding genuine issues of material fact on whether the employer made any impermissible salary reductions where the parties had competing explanations for reduced pay during certain pay periods).

Second, even assuming that the evidence demonstrated conclusively that AEWA consistently paid the class members a fixed weekly salary amount under the pre-2023 pay system, such evidence does not necessarily demonstrate that that pay system satisfies the requirement of Section 604(b) of a "guarantee" that the employees will be paid the required minimum salary each week "regardless of the number of hours, days, or shifts worked." 29 C.F.R. § 541.604(b). Although the United States Court of Appeals for the Fourth Circuit has not considered the guarantee requirement in Section 604(b), the United States Courts of Appeals for the Sixth and Eighth Circuits have both held that this requirement is "legally significant." *Hughes v. Gulf Interstate Field Servs., Inc.*, 878 F.3d 183, 191 (6th Cir. 2017); *Coates*, 961 F.3d at 1048 (quoting *Hughes*, 878 F.3d at 191). In *Hughes*, the court reversed a grant of summary judgment for the defendant employer where the plaintiffs, who were welding inspectors, asserted that they were not exempt from overtime requirements because they were not paid on a salary basis and produced evidence that they had been paid pursuant to a daily rate, even though "there [did] not appear to have been a week during which" the plaintiffs "did not receive pay consistent with a guarantee of a weekly salary equivalent to six days of work at ten hours per day." *Hughes*, 878 F.3d at 185–86, 193. The court found that there remained a genuine issue of material fact on the issue of a guarantee because while the defendant had shown that the plaintiffs were paid "in a way that was *consistent with* a weekly guarantee, it ha[d] not proven unreasonable the conclusion that these payments were matters of grace rather than right." *Id.* at 191.

Here, as in *Hughes*, the record includes evidence that supports Jackson's position that there was no such guarantee under the pre-2023 pay system. As discussed above, the pay stubs issued under that pay system show that the class members' pay was calculated on an hourly basis. *See supra* part I.C.1. Moreover, key AEWA officials acknowledged that the class members, who were classified as exempt employees, were paid on an hourly basis. AEWA's Chief Executive Officer testified in his deposition that "[e]verybody is paid on an hourly rate." J.R. 85. Likewise, a former AEWA HR manager, Corinne Jeffries, had the following exchange during her deposition:

> Q:   Based on what we've looked at so far, you're maintaining that it's your opinion that Mr. Jackson was paid a salary?
> A:   No.
> Q:   I'm sorry. You said "no"?
> A:   I said "no."

J.R. 441.

Significantly, the record contains no direct evidence that despite the hourly pay arrangement, there was a guaranteed minimum weekly salary. Although AEWA points to employment offer letters that reference an annual salary as indirectly supporting such an inference, such evidence is tempered by the numerous notices of pay raises that dispensed with references to an annual salary and instead referred only to an increase in the employee's hourly rate. While the Court does not agree, as claimed by Jackson, that a guarantee must be written into an employment contract, the lack of any such statement, oral or written, is highly relevant, particularly in light of the admissions by company officials that the exempt employees were paid on an hourly basis, without referencing any weekly guarantee. *See Hughes*, 878 F.3d at 192 (considering evidence that the employer had purportedly provided "verbal guarantees" at the outset of employment, but concluding that even with such evidence there remained a genuine issue of material fact precluding summary judgment).

22

In support of its position, AEWA references its practice of requiring the class members, when they did not work a full 40 hours during a work week, to enter vacation or sick leave codes in their timesheets to account for, and then receive, pay for the full 40 hours. Courts have found that requiring employees to use forms of paid leave, such as vacation or sick leave, to make up for hours not worked in a pay period does not violate the salary-basis requirement. *See, e.g.*, *Coates*, 961 F.3d at 1043 (citing U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter on FLSA (Jan. 16, 2009)); *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1200 (10th Cir. 2015); *Litz v. Saint Consulting Grp., Inc.*, 772 F.3d 1, 4–5 (1st Cir. 2014). Thus, the fact that AEWA utilized this practice arguably could support the conclusion that the company was seeking to ensure a certain amount of weekly salary because, as asserted by another former AEWA HR manager, Amber Harris Doyle, this practice ensured that when an exempt employee worked fewer than 40 hours in a week, AEWA would not "just pay them for the hours they only worked." J.R. 136.

At the same time, however, viewed in the light most favorable to Jackson, this practice could also be construed in the opposite way, as such an arrangement is not necessary when there is a guaranteed weekly salary regardless of the number of hours worked. Moreover, the AEWA employee handbook applicable during the use of the pre-2023 pay system specifically stated that if an exempt employee worked fewer than the required hours in a pay period, had exhausted all vacation and sick leave, and had "approach[ed]" the maximum amount of permitted "negative leave" such that the employee could not charge a full work day to such advanced leave, then the exempt employee would "have to complete a Leave of Absence form and that time [would] be unpaid." J.R. 217. This provision, which acknowledges that employees may not be paid their regular amount during a pay period when they use up vacation and sick leave, is inconsistent with paying class members a guaranteed weekly salary regardless of the number of hours that they

23

worked in a week. *See Coates*, 961 F.3d at 1046 (in considering whether summary judgment was warranted on the issue of payment on a salary basis, noting that an admission by a company official that employees might not be paid for time not worked if they use up all of their vacation and sick leave constituted "a damaging admission" on the issue of whether there was a guarantee).

Thus, viewed in the light most favorable to Jackson, the evidence, including pay stubs, admissions of company officials, and the employee handbook, creates a genuine issue of material fact on whether, under the pre-2023 pay system, class members were guaranteed to receive the required minimum weekly salary as "a matter of right" rather than "of grace," as required to be paid on a salary basis pursuant to Section 604(b). *Hughes*, 878 F.3d at 191. Where neither party has offered any specific argument as to whether the current pay system complies with either of the salary-basis tests, AEWA's Motion for Summary Judgment will be denied.

**D.      Jackson's Cross Motion**

In his Cross Motion for Summary Judgment, Jackson asserts that he is entitled to partial summary judgment on the issue of whether the pre-2023 pay system complied with the professional capacity exemption's salary-basis requirement. Based on the same analysis of AEWA's Motion, the Court finds that there are genuine issues of material fact that preclude partial summary judgment in Jackson's favor. *See supra* part I.C. Although the descriptions of the pre-2023 pay system as based on an hourly rate contained in the AEWA offer letters and notices of pay raises, as well as the admissions of AEWA officials, support the conclusion that AEWA paid class members on an hourly basis rather than a salary basis for purposes of Section 602(a), and they provide relevant evidence as to Section 604(b), those statements alone do not support a grant of partial summary judgment to Jackson where, as discussed above, the Section 604(b) salary-basis test permits employers to pay exempt employees on an hourly basis and still comply with the

24

salary-basis requirement if other conditions are met. *See Helix Energy*, 143 S. Ct. at 684. Although Jackson has submitted his chart showing instances in which exempt employees were paid for fewer than 80 hours of work in certain pay periods, the analysis of Dr. Speakman and the explanations provided by Pilkerton are sufficient to establish, at a minimum, a genuine issue of material fact on whether those instances of reduced pay were consistent with a guaranteed minimum weekly salary and, in turn, payment on a salary basis. *See supra* part I.C.2.

Finally, Jackson also argues that AEWA's practice of requiring exempt employees to input vacation and sick leave into their timesheets when they worked fewer hours than required for a particular pay period is further "evidence of [an] hourly pay scheme." Pl.'s Opp'n & Mot. for Summ. J. at 25. However, based on the analysis of this issue discussed above, when viewed in the light most favorable to AEWA, such a practice could be consistent with payment on a salary basis because it may show that the company was seeking to ensure a certain amount of weekly salary even if the employee did not work a full work week. *See supra* part I.C.2.

Where there remain genuine issues of material fact as to whether the class members were paid on a salary basis under the pre-2023 pay system, Jackson's Cross Motion for Summary Judgment will be denied.

## II.    Motion for a Protective Order

In the Motion for a Protective Order, Jackson asserts that AEWA engaged in improper communications with class members during the opt-in period for the FLSA collective action and the opt-out period for the Maryland class action in which it allegedly misled class members about the claims in this case and impacted their willingness to join the lawsuit. Jackson requests various forms of relief including: (1) a protective order prohibiting AEWA from engaging in *ex parte* communications about this case with class members and from retaliating against employees for

25

participating in the lawsuit; (2) an order requiring the issuance by AEWA of a corrective notice to the class members; (3) an order directing AEWA to invite Jackson's counsel to AEWA's premises to host a town hall meeting about this case; (4) the invalidation of all opt-out forms previously received from members of the Maryland class who are current AEWA employees; (5) the reopening of the opt-in period for the FLSA collective action for 60 days; and (6) leave to serve additional requests for production on AEWA related to the allegedly improper communications.

### A.   Legal Standard

Federal district courts have "the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981). That authority extends to collective actions brought under 29 U.S.C. § 216(b), which include FLSA collective actions. *See Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170–71 (1989); *Randolph v. PowerComm Constr., Inc.*, 41 F. Supp. 3d 461, 465 (D. Md. 2014). Pursuant to that authority, courts may enter orders that limit communications between parties and class members if those orders are "based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties," such that the orders are "carefully drawn" to limit "speech as little as possible, consistent with the rights of the parties under the circumstances." *Gulf Oil Co.*, 452 U.S. at 101–02. Judges in this District have thus required the party requesting such a protective order and related relief to show that: (1) "a particular form of communication has occurred or is threatened"; and (2) "the particular form of communication at issue is abusive in that it threatens the proper functioning of the litigation." *Ross v. Wolf Fire Protection, Inc.*, 799 F. Supp. 2d 518, 526 (D. Md. 2011) (quoting *Cox Nuclear Med. v. Gold Cup Coffee Servs., Inc.*, 214 F.R.D. 696, 698 (S.D. Ala. 2003)); *Randolph*, 41 F. Supp. 3d at 465 (quoting *Ross*, 799 F.

26

Supp. 2d at 526). Examples of sufficiently abusive communications include those that (1) seek "to coerce prospective class members into excluding themselves from the litigation"; (2) contain "false, misleading or confusing statements"; or (3) undermine "'cooperation with or confidence in class counsel.'" *Ross*, 799 F. Supp. 2d at 526 (quoting *Cox Nuclear Med. v. Gold Cup Coffee Servs., Inc.*, 214 F.R.D. 696, 698 (S.D. Ala. 2003)).

### B.     Abusive Communications

As to the first element, the parties do not dispute that AEWA communicated with the class members relating to this litigation on at least three occasions. First, in July 2023, before the Court had either conditionally certified the FLSA collective action or certified the Maryland class action, James Donovan, AEWA's Chief Operating Officer, called Jackson, offered to settle Jackson's claims with AEWA, and then sent Jackson a text message thanking him for speaking on the phone and stating that he "believe[d] it would be in everyone's best interest to come to a mutual agreement and avoid the painful and drawn-out court process." Mot. Prot. Order Ex. 3, ECF No. 94-3. Jackson did not respond to engage in any settlement discussions.

Second, on August 31, 2023, the day after the court-approved notice of the conditionally certified FLSA collective action was sent to class members ("the FLSA notice"), Donovan asked all AEWA supervisors, a group that includes some class members, to attend one of two audio meetings that he planned to host that day about the FLSA collective action. In the email invitation, Donovan stated that the purpose of the meetings was to discuss the FLSA notice, that he "would like al[l] supervisors to have this information so they can address any questions that may be presented to them by our workforce," and that if any supervisors could not attend either of the meetings, they should contact him to make other plans to discuss the information. Opp'n Mot. Prot. Order Ex. 2, ECF No. 98-2.

27

Third, on March 5, 2024, one day after the class members were sent the court-approved notice relating to the certified Maryland class action ("the Maryland notice"), Donovan sent another email to all AEWA supervisors stating that:

> Recently, many of our employees received a notice from the law firm of Josephson Dunlap, a law firm out of Texas that is engaged in a class action law suit against [AEWA] for our overtime policy related to Fair Labor Standards Act (FLSA)-Exempt employees. They allege our policy of paying "straight time for overtime" to **Exempt Employees** is flawed and that even Exempt employees should be paid time-and-a-half for overtime. We vehemently disagree with this and are fighting this law suit in court. [AEWA] has paid our workforce fairly over the past 40 years in accordance with all laws. The FLSA clearly spells out who is exempt and is who not exempt, and stipulates in which instances employees receive time-and-a-half and when they do not. We stand behind out policies and vow to fight this law suit.
>
> This law suit is covered at the Federal and State Level with a different method of inclusion into the Class. At the Federal Level, employees were required to **Opt In** if they wanted to be part of the Class. At the State Level it is a little different: Employees are automatically part of the Class and, if they do not want to be part of the class, they must **Opt Out** – by following the link in the notice and signing the Exclusion Form, expressly Opting Out.
>
> [AEWA] is **NOT** advising any employee on what they should do. This email is simply to ensure our workforce understands that, unless they Opt Out by signing the Exclusion Form, they will automatically be a part of the Class Action Suit.
>
> If you or any of your employees have any questions about this, please feel free to have them contact me directly.

Opp'n Mot. Prot. Order Ex. 3, ECF No. 98-3. Donovan directed the supervisors to "afford this notice the widest dissemination possible." *Id.* The next day, Donovan sent a follow-up email to a smaller group of AEWA employees, which also included some class members, to address clarifying questions about his March 5 email. In the follow-up email, Donovan stated that only class members should have received the Maryland notice, identified for the group which individuals in the group were class members, and told two class members in the group that if they had not received the Maryland notice, he could send it to them and they could "choose whether to Opt Out or not." Opp'n Mot. Prot. Order Ex. 4, ECF No. 98-4. One of those individuals then

28

asked Donovan if he could send her the Maryland notice, and Donovan sent it to her and the other class member in the group.

To date, out of 127 current or former AEWA employees who were eligible for the FLSA class, only 16 have opted into the FLSA class, including only 3 of the 85 eligible current employees. Out of the 177 current or former AEWA employees who were a part of the Maryland class, 47 individuals have opted out of the Maryland class, including 41 of the 106 eligible current employees.

As to whether Donovan's communications with the class members were "abusive" in that they "threaten[ed] the proper functioning of the litigation," *Ross*, 799 F. Supp. 2d at 526, the Court does not consider Donovan's text message to Jackson in July 2023 in which he offered to engage in settlement discussions to meet this standard in part because it occurred between parties to the lawsuit and before the FLSA collective action and the Maryland class action were certified. *Cf. Dorsey v. Home Depot U.S.A., Inc.*, 271 F. Supp. 2d 726, 730 (D. Md. 2003) (noting that "[n]othing in the law prohibits litigants or potential litigants from speaking among and between themselves, as opposed to attorneys for such parties attempting direct communications with represented parties).

The Court finds, however, that the second and third communications, considered together, "threaten[ed] the proper functioning of the litigation." *Ross*, 799 F. Supp. 2d at 526. Although there is no precise record of Donovan's communications to AEWA supervisors during the August 31, 2023 meetings about the FLSA notice, Donovan stated in his deposition that he did not show that notice during the meetings, did not read from the scripts approved by the Court for use by counsel when communicating with class members about that notice, and did not tell the supervisors that they should contact Jackson's counsel with any questions about the FLSA collective action,

as stated in the FLSA notice.  By omitting such information during his discussions with class

members, Donovan undermined cooperation with Jackson's counsel, particularly by not showing

the FLSA notice or discussing its direction to class members to communicate with Jackson's

counsel if they had any questions about the case.  *See Jones v. Hoffberger Moving Servs. LLC*, No.

13-cv-0535-JKB, 2013 WL 5973145, at *4 (D. Md. Nov. 8, 2013) (finding that communications

between an employer and putative FLSA collective action members which omitted copies of the

complaint, an explanation of the alleged misconduct, and the contact information for plaintiffs'

counsel, though not threatening "the proper functioning of the litigation," were "not the ideal of a

'neutral, balanced, and complete' communication" and thus warranted certain corrective

measures); *Stransky v. HealthONE of Denver, Inc.*, 929 F. Supp. 2d.1100, 1105–07 (D. Colo.

2013) (in an FLSA collective action, finding that an in-person meeting by the defendant employer

with opt-in plaintiffs in which "confusing and misleading information" was provided was improper

because "it infringed upon the Court's control over communications, and contravened the purpose

of a Court-approved Notice to the class").

     As for the third communication, Donovan's March 5, 2024 email about the Maryland

notice, it contains misleading statements that likely undermined the class action process in that it

presents only AEWA's perspective on Jackson's claims, including by stating that AEWA "has

paid our workforce fairly over the past 40 years in accordance with all laws," Opp'n Mot. Prot.

Order Ex. 3, despite the fact that the Maryland notice states that the Court had not yet ruled on the

merits of the claims or defenses in this case.  *See Belt v. EmCare, Inc.*, 299 F. Supp. 2d 664, 666–

67 (E.D. Tex. 2003) (finding that a letter sent by a defendant-employer to class members "just

before" the court-approved notice was sent mischaracterized the claims in the lawsuit and the

damages available to class members in a way that "discourage[d] absent class members from joining the suit").

Moreover, when Donovan's one-sided presentation of the lawsuit is considered alongside (1) his statement in the March 5, 2024 email that the communication's purpose was "to ensure our workforce understands that, unless they Opt Out by signing the Exclusion Form, they will automatically be a part of the Class Action Suit," Opp'n Mot Prot. Order Ex. 3, and (2) the fact that it was sent the day after class members received the Maryland notice, the Court finds that the email was intended to and likely did subvert the class action process by interfering with class members' ability to make informed choices about whether to participate in the lawsuit. *See Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1198, 1203 (11th Cir. 1985) (noting that "[u]nsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts, without opportunity for rebuttal" and upholding an order prohibiting communications between a defendant and class members imposed in response to defendant-initiated communications that attempted to solicit opt-out commitments from class members); *Belt*, 299 F. Supp. 2d at 669 (finding that an employer's misleading letter to employees about an FLSA collective action was "intended to undermine the purposes of the collective action" and "subvert the Court's carefully crafted notice and its role in administering the collective action" in part because it was sent with no notice to the plaintiff or the court and soon before a court-approved notice was to be released). This conclusion is bolstered by the fact that the share of current AEWA employees who failed to opt into the FLSA collective action or opted out of the Maryland class action is notably higher than the share of former employees who made those same decisions. Accordingly, the Court concludes that AEWA, through its Chief Operating Officer, Donovan, engaged in abusive communications with the class

31

members about the FLSA collective action and the Maryland class action that require remedial measures.

## C.    Relief

The Court will grant some of the forms of relief that Jackson has requested. First, where the Court has concluded that AEWA engaged in abusive communications with the class members, it will enter an Order prohibiting AEWA from engaging in further *ex parte* communications with class members about the lawsuit or retaliating against them. *See Randolph*, 41 F. Supp. 3d at 467. Second, where the Court has found that AEWA's communications contained misleading statements that discouraged participation in this lawsuit and undermined cooperation with Jackson's counsel, and supervisors were directed to give those communications "the widest dissemination possible," Opp'n Mot. Prot. Order Ex. 3, the Court will order the issuance of a corrective notice on AEWA letterhead and at AEWA's expense to the class members who were current AEWA employees as of August 31, 2023, March 5, 2024, or both, and it will order that these same class members have an additional 60 days to opt into the FLSA collective action. *See Belt*, 299 F. Supp. 2d at 669–70. Although Jackson has submitted a proposed corrective notice, the Court will issue a more limited version that explains the need for the corrective notice, reinforces the guidance in the FLSA notice and the Maryland notice, provides a neutral explanation of class members' options to opt in or opt out, and provides notice of specific deadline extensions.

The Court declines to issue the other forms of requested relief. As to the request that the Court order AEWA to invite Jackson's counsel to AEWA's premises to host a town hall meeting about this case, Jackson has provided no precedent supporting this kind of relief, and the Court finds that doing so would only further undermine the collective and class action process by creating a new opportunity for one side to present its view of the litigation without close supervision by the

32

Court. *See Stransky*, 929 F. Supp. 2d at 1106–07 (finding that in-person meetings with class members, regardless of whether they were hosted by the plaintiffs or the defendant and regardless of whether they were intended to mislead class members or not, were improper unilateral communications that contravene the purpose of court-approved notices).

Further, where the Court has not concluded that AEWA coerced any specific individuals to opt out of the Maryland class action, it will also deny Jackson's request to invalidate all of the opt-out forms submitted by current AEWA employees. Though communications between an employer and its employees have a "heightened potential for coercion," *Belt*, 299 F. Supp. 2d at 668, and Donovan's March 5, 2024 email gave a one-sided view of the merits of the case and overly emphasized how to opt out of the Maryland class action in a way that could be construed as encouraging that action, that message was tempered in part by the additional statement that AEWA was "**NOT** advising any employee on what they should do." Opp'n Mot. Prot. Order Ex. 3. The Court therefore declines to invalidate the opt-out forms submitted by current AEWA employees. *See Jones v. Fidelity Res., Inc.*, No. SAG-17-1447, 2020 WL 2112141, at *2, *4 (D. Md. May 4, 2020) (finding that the court was "unable to make the significant finding required to invalidate a litigant's decision to opt out" of a class action based solely on an anonymous allegation from one class member that she had been subjected to harassment and intimidation after she did not tell her employer that she would opt out of the class action). Nevertheless, in recognition of the fact that Donovan's March 5, 2024 email may have misled or confused some class members about the nature of the claims in the lawsuits and may have unduly encouraged them to opt out of the Maryland class action, *see supra* part II.B, the Court will order that class members who were current employees at the time of AEWA's communications and previously opted out of the

Maryland class action be given the option to reverse that decision and opt back in within 60 days of the issuance of the corrective notice.

Finally, as to Jackson's request for leave to serve additional requests for production on AEWA relating to this issue, where the Court has already determined that the present record warrants granting Jackson most of the requested relief, the Court finds that such additional discovery is unnecessary.

Accordingly, the Motion for a Protective Order will be granted in part in that the Court will (1) prohibit AEWA from engaging in further *ex-parte* communications with class members about this litigation or retaliating against them; (2) direct AEWA to issue a court-approved corrective notice on its letterhead and at its expense to all class members who were employed by AEWA as of August 31, 2023, March 5, 2024, or both; (3) permit the class members who receive the corrective notice to opt into the FLSA collective action within 60 days of the issuance of the corrective notice; and (4) permit the class members who receive the corrective notice and who previously opted out of the Maryland class action to opt back into the Maryland class action within 60 days of the issuance of the corrective notice. The Motion will otherwise be denied.

## CONCLUSION

For the foregoing reasons, AEWA's Motion for Summary Judgment will be DENIED, Jackson's Cross Motion for Summary Judgment will be DENIED, and Jackson's Motion for a Protective Order, Corrective Notice, and Additional Requests for Production will be GRANTED IN PART and DENIED IN PART as specified in the accompanying Order. A separate Order shall issue.

Date:   June 9, 2025



THEODORE D. CHUANG
United States District Judge

34